No. 25-51040

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

JED WALLACE; STREET RELATIONS, INCORPORATED,

*Plaintiffs-Appellants,*

v.

BLAKE LIVELY,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the
Western District of Texas, Austin Division

---

## BRIEF OF APPELLANTS

---

Jeffrey L. Oldham
JACKSON WALKER LLP
100 Congress, Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 (fax)

Charles Lynde Babcock
Joel Robert Glover
JACKSON WALKER LLP
1401 McKinney Street
Houston, Texas 77010
(713) 752-4200
(713) 308-4110 (fax)
cbabcock@jw.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF INTERESTED PERSONS**

No. 25-51040, *Wallace v. Lively*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Plaintiffs-Appellants are Jed Wallace and Street Relations, Inc. Street Relations, Inc. does not have any parent, subsidiary, or affiliate companies. Jed Wallace is the sole director of Street Relations, Inc.

2. Plaintiffs-Appellants are represented in the Fifth Circuit by:

| | |
|---|---|
| Jeffrey L. Oldham | Charles Lynde Babcock |
| JACKSON WALKER LLP | Joel Robert Glover |
| 100 Congress, Suite 1100 | JACKSON WALKER LLP |
| Austin, Texas 78701 | 1401 McKinney Street |
| (512) 236-2000 | Houston, Texas 77010 |
| (512) 236-2002 (fax) | (713) 752-4200 |
| | (713) 308-4110 (fax) |

In the district court, Plaintiffs-Appellants were represented by attorneys from Jackson Walker LLP (some of whom are no longer at the firm), including Charles Babcock, Joel Glover, Carl Butzer, Matt Dow, Minoo Blaesche, Katharine Carmona (former), Cody Vaughn, and Tori Emery.

i

3.     Defendant-Appellee is Blake Lively.

4.     Defendant-Appellee is represented by:

Michael J. Gottlieb
Kristin Bender
Aaron E. Nathan
WILLKIE FARR & GALLAGHER LLP
1875 K Street
Washington, D.C. 20006
(202) 303-1245

Laura Lee Prather
Catherine L. Robb
Michael J. Lambert
Reid Pillifant
HAYNES AND BOONE, LLP
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 867-8400
(512) 867-8470 (fax)


/s/ *Charles Lynde Babcock*
Charles Lynde Babcock
Counsel for Plaintiffs-Appellants

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal presents a personal-jurisdiction issue that is important and arises from a complex set of facts involving multiple cases in different states. Plaintiffs-Appellants believe oral argument would benefit the Court in assessing how this factual background impacts the jurisdictional analysis and how the district court legally erred in concluding that it lacks personal jurisdiction here despite Defendant-Appellee's meaningful Texas-targeted actions.

TABLE OF CONTENTS

Certificate of Interested Persons ................................................................i

Statement Regarding Oral Argument ......................................................iii

Table of Authorities.................................................................................vi

Introduction .............................................................................................. 1

Jurisdictional Statement.......................................................................... 6

Statement of the Issues............................................................................ 6

Statement of the Case .............................................................................. 7

I.    Factual background........................................................................ 7

II.   Procedural background ............................................................... 15

Summary of the Argument .................................................................... 16

Argument................................................................................................. 20

I.    This Court reviews the ruling below de novo .............................. 20

II.   The district court erred by dismissing the Wallace Parties'
      claims and failing to find specific personal jurisdiction here........ 23

      A.    Lively has sufficient minimum contacts with Texas for
            specific personal jurisdiction, and the district court
            legally erred in concluding otherwise ................................... 24

            1.    The district court misapplied the controlling
                  standard in numerous ways ........................................ 28

            2.    Properly   analyzed,   Lively's   Texas-directed
                  activities satisfy the "minimum contacts" needed
                  to support specific personal jurisdiction...................... 39

            3.    The authorities relied on by Lively and the district
                  court are materially distinguishable ........................... 46

B.   The Wallace Parties' claims arise out of or relate to Lively's Texas contacts........................................................ 49

C.   Exercising jurisdiction over Lively is fair and reasonable, and Lively did not argue otherwise................... 52

Conclusion ................................................................................................. 55

Certificate of Service ................................................................................ 56

Certificate of Compliance ........................................................................ 57

## TABLE OF AUTHORITIES

**Cases**

*Allred v. Moore & Peterson,*
117 F.3d 278 (5th Cir. 1997)..................................... 25, 28, 32, 33, 40

*Bullion v. Gillespie,*
895 F.2d 213 (5th Cir. 1990)....................................................... 29, 39

*Burger King v. Rudzewicz,*
471 U.S. 462 (1985)...................................................... 25, 32, 53, 54

*Calder v. Jones,*
465 U.S. 783 (1984) .................................................................. *passim*

*Carmona v. Leo Ship Mgmt., Inc.,*
924 F.3d 190 (5th Cir. 2019)...................................................... 21, 24

*Cent. Freight Lines Inc. v. APA Transp. Corp.,*
322 F.3d 376 (5th Cir. 2003)...................................................... 25, 29

*Clemens v. McNamee,*
615 F.3d 374 (5th Cir. 2010).......................................... 21, 22, 27, 48

*Daughtry v. Silver Fern Chem., Inc.,*
138 F.4th 210 (5th Cir. 2025) ......................................................... 27

*Def. Distributed v. Grewal,*
971 F.3d 485 (5th Cir. 2020) ....................21, 22, 27, 40, 42, 44, 45, 46

*DeJoria v. Maghreb Petroleum Expl., S.A.,*
804 F.3d 373 (5th Cir. 2015)........................................................... 53

*Elec. & Gas Tech, Inc. v. Universal Commc'n Sys., Inc.,*
2003 WL 22838719 (N.D. Tex. 2003)............................................... 36

*Fielding v. Hubert Burda Media, Inc.,*
415 F.3d 419 (5th Cir. 2005).......................................... 27, 46, 47, 48

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
592 U.S. 351 (2021)................................................. 49, 50, 51, 52, 54

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*,
  921 F.3d 522 (5th Cir. 2019)..................................................30

*Herman v. Cataphora*,
  730 F.3d 460 (5th Cir. 2013).......................................... 48, 49

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ........................................ 22, 49

*Metro Equip. & Rental Co., Inc. v. Tsurumi Mfg. Co., Ltd.*,
  2022 WL 1491099 (W.D. Tex. 2022) ................................39

*Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*,
  100 F.3d 1353 (7th Cir. 1996)..........................................33

*Miss. Interstate Exp., Inc. v. Transpo, Inc.*,
  681 F.2d 1003 (5th Cir. 1982)............................. 23, 25, 32

*Moncrief Oil Int'l Inc. v. Oao Gazprom*,
  414 S.W.3d 142 (Tex. 2013) ............................................53

*Mullinix v. Thirty-Eight Street, Inc.*,
  2019 WL 4579869 (W.D. Tex. 2019) ...............................37

*PaineWebber Inc. v. Chase Manhattan Priv. Bank (Switz.)*,
  260 F.3d 453 (5th Cir. 2001)............................................30

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
  2000 WL 35615925 (N.D. Tex. 2000)................................38

*Ramirez v. Chenega Corp.*,
  2006 WL 8434037 (W.D. Tex. 2006) ...............................37

*Revell v. Lidov*,
  317 F.3d 467 (5th Cir. 2002).........................22, 23, 25, 27, 28, 31, 32

*Salermo v. Hughes Watters & Askanase LLP*,
  516 F. Supp. 3d 696 (S.D. Tex. 2021) .............................36

*Seiferth v. Helicopteros Atuneros, Inc.*,
  472 F.3d 266 (5th Cir. 2006) ............................. 23, 52, 53

*Stone v. Shafran,*
  641 F. Supp. 3d 1344 (S.D. Fla. 2022) ................................................ 42

*Stripling v. Jordan Prod. Co., LLC,*
  234 F.3d 863 (5th Cir. 2000) ......................................................... 21

*Tittle v. Kan. Geological Soc'y,*
  2009 WL 10704726 (N.D. Tex. 2009) ............................................. 38

*Utterkar v. Ebix, Inc.,*
  2015 WL 5027986 (N.D. Cal. 2015) ................................................ 36

*Walden v. Fiore,*
  571 U.S. 277 (2014) .................................................................... 49

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,*
  517 F.3d 235 (5th Cir. 2008) ..................................... 20, 21, 28, 29, 33

*Wallace v. Herron,*
  778 F.2d 391 (7th Cir. 1985) ....................................................... 26

*Wien Air Alaska, Inc. v. Brandt,*
  195 F.3d 208 (5th Cir. 1999) ................................... 26, 32, 33, 40, 44

*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980) .................................................................... 35

## Statutes

28 U.S.C. § 1291 ........................................................................... 6

28 U.S.C. § 1332 ........................................................................... 6

## Constitutional Amendment

U.S. Const. amend. XIV .................................................................. 22

## INTRODUCTION

This case arises from a high-profile, complex Hollywood saga, but deciding that Texas courts have personal jurisdiction here—the only question on appeal—should be straightforward. An out-of-state defendant published false and defamatory accusations about the Texas residents-plaintiffs, emphasizing in those statements that the plaintiffs are located in Texas and that the alleged conduct occurred in Texas. The defendant then literally invoked the jurisdiction of a Texas court to investigate those accusations. The defendant also hired Texas counsel to pursue her Texas lawsuit, paid filing fees to the Texas court, and contracted with Texas process servers to serve a Texas resident. She also caused her defamatory statements to be republished *in Texas media.* She then traveled to Texas and, it is alleged, refused to retract and indeed repeated those defamatory statements while there.

Under decades of controlling precedent from this Court and the Supreme Court, these facts should easily be enough to establish specific personal jurisdiction. Yet the district court dismissed the claims, misapplying the law in multiple ways to allow the defendant to escape the jurisdiction of Texas' courts. This requires reversal.

1

Specifically, Plaintiffs Jed Wallace and Street Relations, Inc. (collectively, the "Wallace Parties") were thrust into a global media firestorm on December 20, 2024 at the hands of actress Blake Lively, the Defendant here.  That is when Lively filed a complaint with the California Civil Rights Division (the "CRD Complaint") and attached a draft legal complaint (the "Draft Complaint"), both of which named the Wallace Parties as respondents or purported defendants.  These filings were not immediately accessible by the public, yet *within minutes* Wallace was contacted by a reporter seeking comment and then *minutes* later the *New York Times* published the CRD Complaint and Draft Complaint, all from Lively or her agents allegedly providing them to the press.  The documents accused the Wallace Parties of conduct including "sexual harassment" and "retaliation" relating to a film—accusations that were disseminated to the press and republished by media outlets around the world, including in Texas, within hours of filing.

Critically, when Lively filed a finalized version of her claims in federal court in New York just eleven days later, she did *not* include the Wallace Parties as defendants.  But the Wallace Parties—who had no involvement in the production of the film at issue, who never interacted

2

with Lively, and whose work consisted entirely of monitoring social media from their Texas home base—were nonetheless left to suffer the devastating reputational, economic, and emotional consequences of Lively's false but widely circulated accusations.

The Wallace Parties therefore sued Lively for defamation, and did so in Texas due to her extensive and purposeful connections there. In her CRD and Draft Complaints, Lively herself made Texas the focal point of her accusations, repeatedly emphasizing that the Wallace Parties are "Texas-based" or "based in Austin, Texas." She knew her false statements would harm the Wallace Parties in Texas because she expressly targeted them there. The brunt of the reputational, economic, and emotional harm from Lively's defamation was suffered in Texas, where the Wallace Parties live, work, and operate their business.

But Lively's Texas-directed conduct went well beyond the CRD and Draft Complaints. In January 2025, Lively affirmatively invoked the jurisdiction of a Texas court by contracting with a Texas law firm and filing a Rule 202 petition for pre-suit deposition in Hays County, Texas— seeking evidence relating to the very same false allegations she published in the CRD and Draft Complaints. In her verified petition, Lively swore

3

under oath that "a substantial part of the events giving rise to the claims that [Lively] seeks to investigate occurred in Hays County, [Texas]." She paid a filing fee to the Hays County clerk. She also contracted with two Texas process-server companies to serve Wallace at his private residence in the Texas hill country. And her agents made seven service attempts before Lively ultimately nonsuited the petition.

Lively then traveled to Texas on multiple occasions. In March 2025, she appeared with her publicists at the South by Southwest (SXSW) conference in Austin, Texas. When confronted by a Texas resident about her accusations, Lively did not retract or clarify her prior false statements, instead allowing them to stand. She also traveled to Waco, Texas where, the Wallace Parties allege, she made additional defamatory remarks about them.

Under Fifth Circuit precedent, this constellation of Texas-directed conduct establishes minimum contacts sufficient to support specific personal jurisdiction. The *Calder* "effects" test is satisfied because Lively aimed her defamatory statements at the Wallace Parties in Texas, knew the brunt of the harm would be felt there, and made Texas the focal point of her accusations. But even apart from *Calder*, Lively purposefully

4

availed herself of the benefits and protections of Texas law when she affirmatively invoked the Texas judicial system, paid a Texas law firm and Texas court filing fees, and contracted with Texas process servers. And her in-state visits—during which she allegedly refused to retract her defamatory statements and made more—provide further evidence of her purposeful contacts with the forum. Considered in the aggregate, as the law requires, these contacts compel a finding of personal jurisdiction.

In concluding otherwise and dismissing this suit, the district court legally erred in at least three key respects. First, the court misapplied the controlling legal standard by improperly weighing jurisdictional evidence rather than crediting the Wallace Parties' uncontroverted allegations and resolving factual disputes in their favor. That included imposing a heightened evidentiary burden based on the progression of discovery in separate litigation in the Southern District of New York, in which the Wallace Parties successfully objected to the court's personal jurisdiction. Second, the court examined Lively's interrelated Texas contacts in isolation rather than conducting the aggregate analysis that this Court's precedent requires. Third, the court categorically rejected the Wallace Parties' detailed "information and belief" allegations

regarding Lively's in-state defamatory conduct despite Lively's failure to submit any controverting evidence.

For these and other reasons set forth below, the Court should reverse, hold that the district court has personal jurisdiction over the Wallace Parties' claims, and remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332, and this appeal asks whether it can exercise personal jurisdiction over Lively.  Because the district court dismissed the Wallace Parties' claims without prejudice based on its ruling that it lacked personal jurisdiction, ROA.4460, this Court has jurisdiction under 28 U.S.C. § 1291.  The Wallace Parties timely appealed.  ROA.4461-62.

## STATEMENT OF THE ISSUES

Whether the district court erred in determining that it lacks personal jurisdiction over Defendant Lively and in dismissing the Wallace Parties' claims, including by misapplying the legal standard on specific personal jurisdiction.

**STATEMENT OF THE CASE**

## I.    Factual background.

This case arises out of one of the most publicized Hollywood disputes in recent times: the fallout between actress Blake Lively and actor-director Justin Baldoni following the production and release of the film *It Ends With Us* (the "Film").  ROA.1782.  Plaintiffs Jed Wallace and Street Relations, Inc. were caught in the middle—and thrust into the spotlight—of this drama when Lively decided to file, and then allegedly publicize by sharing with the press, a complaint and attached draft complaint that purported to name the Wallace Parties as respondents or defendants, alongside Baldoni and others, and alleged they engaged in conduct including "sexual harassment; retaliation; failure to investigate, prevent, and/or remedy harassment; and aiding and abetting harassment and retaliation."  ROA.1783-84, 1789-90, 1812-13, 1816.  Lively did not include the Wallace Parties as defendants when she filed the finalized version of the attached complaint eleven days later, ROA.1784-85—but the damage was already done, and has only continued.

**A.**    Jed Wallace is a Texas resident who lives in Dripping Springs, Texas.  ROA.1788.  He is the owner and founder of Street Relations, Inc.,

7

a crisis mitigation firm that primarily assists people who find themselves unjustly attacked, extorted, doxed, swatted, scammed, or otherwise needing help navigating their most frightening situations. ROA.1788. Street Relations is a Texas corporation that has maintained its principal place of business in Texas since 2021. ROA.1788.

Defendant Lively is an actress and entrepreneur who resides in New York. ROA.1789.

**B.** The events all stem from the Film, *It Ends With Us*, in which Livey starred as the female lead. ROA.1889. Justin Baldoni was her co-lead. ROA.1889. The Film was directed by Baldoni and produced by Wayfarer Studios ("Wayfarer"), the movie studio founded by Baldoni and his business partner. ROA.1827-28. The Film premiered in New York City on August 6, 2024, but weeks earlier, one cut of the Film was previewed in Grapevine, Texas at the Book Bonanza event for the Film—an event attended by Lively, another Film co-actor, and the author of the book on which the Film was based. ROA.1789, 1799-1800.

The Wallace Parties had no involvement in making or marketing the Film. ROA.1783, 1785, 1804. Nor did they ever interact with Lively at any time or step foot on the Film's set. ROA.1783, 1785, 1804.

The August 6, 2024 New York premiere sparked online chatter when fans noticed that, not only had Lively and Baldoni not been participating in joint press events together, but the two co-leads in the Film also were not photographed together at the premiere. ROA.1848. The next day, Wayfarer's public relations firm—The Agency Group PR ("TAG")—approached Wallace about Street Relations helping with social and digital mitigation and remediation regarding Wayfarer. ROA.1789.

On August 9, 2024, Street Relations began work on a three-month project that involved monitoring social media regarding the movie and its two stars. ROA.1789. In particular, Street Relations was retained to conduct analyses of all forms of media, analyze the sentiment of the coverage as it related to the Film and the co-stars, and then provide updates on the observations. ROA.2436-37. Street Relations' role was limited to reading, analyzing, and assessing media and trends regarding various issues, and its work was done entirely and exclusively from the company's home base in Texas. ROA.2436.

As alleged, Wallace—in his role as an employee of Street Relations, and after passively observing the social media environment—saw an organic outpouring of support for Baldoni and the Film. In addition to

observing the organic support of Baldoni, Wallace observed a general dislike and negative sentiment for Lively based on her tone-deaf promotion of the Film. ROA.2437. Based on what he saw, Wallace believed that no remedial action was needed and that the online sentiment and conversation should unfold organically. ROA.2437.

**C.** On December 20, 2024, Lively filed the "CRD Complaint," an administrative complaint with the California Civil Rights Division. ROA.1812-14. The CRD Complaint consisted of a three-page intake form and the 62-page "Draft Complaint" as an attachment styled as a draft federal complaint. ROA.1812-77.

The CRD Complaint named the Wallace Parties as "Respondents" alongside Baldoni, Wayfarer, and others, and alleged the respondents "engaged in a variety of conduct in violation of California Government Code section 12940 ('FEHA') and Title VII of the Civil Rights Act of 1964" including "sexual harassment; retaliation; failure to investigate, prevent, and/or remedy harassment; and aiding and abetting harassment and retaliation." ROA.1813. Similarly, the Draft Complaint attached to and submitted with the CRD Complaint named the Wallace Parties as "Defendants" and purported to seek damages for: "sexual harassment;"

"retaliation" under California Government Code section 12940; "failure to investigate, prevent, and/or remedy harassment;" "retaliation" under California Labor Code section 1102.5; "aiding and abetting harassment and retaliation;" "breach of contract:" "intentional infliction of emotion distress;" "negligence;" "false light invasion of privacy;" and "interference with prospective economic advantage." ROA.1816.

In connection with Lively's false statements about the Wallace Parties, Lively specifically focused on Texas. She stated throughout the Draft Complaint that the Wallace Parties are "a Texas-based contractor . . . who weaponized a digital army around the country . . . to create, seed, and promote content that appeared to be authentic on social media platforms and internet chat forums." ROA.1824. She also asserted that Wallace is "an independent contract based in Austin, Texas, who was retained . . . to seed and influence online forums." ROA.1859.

News of the substance of these not-readily-available filings spread quickly. Specifically, the CRD and Draft Complaints filed with the California agency were not available online or otherwise available to the public absent a written request for public information. ROA.1783. Yet, on the evening of December 20, 2024—the same day the CRD and Draft

11

Complaints were filed—a reporter sent Wallace an "urgent" email stating that she had "learned that Ms. Lively filed a legal complaint against you . . . alleging sexual harassment, retaliation . . . among other claims." ROA.1783. The reporter described details from the Draft Complaint and demanded a response by noon the following day. ROA.1783-84.

By early the next morning (December 21, 2024), that reporter's newspaper had posted the Draft Complaint—allegedly provided by Lively—on its website under the banner "READ THE COMPLAINT." ROA.1784. That same day, *The New York Times* published a lengthy article entitled "'We Can Bury Anyone': Inside a Hollywood Smear Machine," touting exclusive access to "thousands of pages of text messages . . . and other documents [which] were reviewed by the [newspaper]." ROA.1784, 2137-48. Additional media organizations, including *The Hollywood Reporter*, *TMZ*, *E!News*, *Variety*, *Today*, *CNN*, *People Magazine*, *Fox News*, and *USA Today*, all reported on the CRD and Draft Complaints the same day, giving prominence to Lively's allegations. ROA.1784. And the next day (December 22, 2024), more media—including at least three media outlets in Texas—reported on the CRD and Draft Complaints. ROA.1784. The false allegations against

the Wallace Parties made headlines around the world as a result of Lively allegedly disseminating the CRD and Draft Complaints or the contents within them. ROA.1801.

**D.** On December 31, 2024, Lively filed a federal lawsuit in the Southern District of New York. ROA.1784-85. Notably, the document filed in federal court—unlike the CRD and Draft Complaints—did *not* name the Wallace Parties as defendants or respondents. ROA.1785.

Three weeks later, on January 21, 2025, Lively hired a Texas law firm, paid a filing fee with the Hays County clerk, and filed in Hays County, Texas a petition for pre-suit deposition under Texas Rule of Civil Procedure 202, seeking to obtain evidence relating to the false statements that she had made in the CRD and Draft Complaints. ROA.1785-86, 2474-88. In that verified petition, Lively represented to the Texas court under oath that she needed the discovery "to understand and evaluate potential claims." ROA.2483. Lively reiterated her focus on the Wallace Parties being located in Texas, emphasizing—consistent with her prior publication of false statements—that "Wallace worked remotely from Dripping Springs, Texas . . . to undermine the credibility of and retaliate against Ms. Lively through this 'social manipulation' campaign."

13

ROA.2477. And Lively confirmed that "a substantial part of the events giving rise to the claims that [Lively] seeks to investigate"—the same, false claims she previously made in the CRD and Draft Complaints— "occurred in Hays County, [Texas]." ROA.3511.

Lively contracted with two Texas process-server companies to effectuate service of her Hays County lawsuit on Texas resident Wallace. ROA.3382-83, 3385. These agents made seven attempts to serve Wallace at his private residence in the Texas hill country. ROA.3382-83, 3385.

Ultimately, on February 4, 2025 before the Texas court could rule on the petition and before Lively's contracted process servers secured service of process, Lively nonsuited her Rule 202 petition. ROA.3458. That same day, the Wallace Parties initiated this federal lawsuit in the Western District of Texas, asserting defamation claims. ROA.4. Lively then filed in the Southern District of New York litigation, fourteen days later, an amended complaint adding the Wallace Parties as defendants and asserting claims against them for aiding and abetting harassment and retaliation, intentional infliction of emotional distress, false light invasion of privacy, and civil conspiracy. ROA.1786-87, 1956-2096.

14

In the weeks that followed, Lively traveled to Texas on multiple occasions. In March 2025, she appeared at the SXSW conference in Austin, Texas, accompanied by her publicists. ROA.1787. During this visit, when confronted by a Texas resident who stated "Blake Lies" and referenced "Justice for Justin," Lively allegedly did not retract or clarify her prior statements about the Wallace Parties, instead allowing her false statements to stand. ROA.1787. She also traveled to Waco, Texas, where she allegedly made more defamatory remarks. ROA.1787.

## II.    Procedural background.

The Wallace Parties filed this suit against Lively, alleging claims for defamation and defamation per se, on February 4, 2025. ROA.12-21; *see also* ROA.1782-1807 (first amended complaint). Lively moved to dismiss the Wallace Parties' claims for lack of personal jurisdiction, improper venue, and failure to state a claim. ROA.2935-81.

Without holding an evidentiary hearing, the district court (Judge David Ezra) granted Lively's motion to dismiss for lack of personal jurisdiction, declined to address other grounds for relief, and dismissed the Wallace Parties' claims without prejudice. ROA.4440-60. The Wallace Parties timely appealed. ROA.4461-62.

15

## SUMMARY OF THE ARGUMENT

The district court legally erred in deciding it lacks specific personal jurisdiction and dismissing on that basis. In particular, the district court committed at least three critical errors in assessing whether Lively has sufficient "minimum contacts" in Texas that the Wallace Parties' claims arise out of or relate to. One, the court wrongly *weighed* jurisdictional evidence instead of accepting as true the Wallace Parties' uncontroverted allegations and resolving fact disputes in their favor, thus contravening the governing legal standard. Two, the court improperly played divide-and-conquer on Lively's Texas contacts, assessing them in isolation rather than conducting the aggregate analysis this Court's precedent requires. Three, the court disregarded the Wallace Parties' detailed "information and belief" allegations even though Lively failed to submit any controverting evidence. Each error justifies reversal, and together they reflect a fundamental misapplication of controlling law.

The governing legal framework is well-established. Under *Calder v. Jones*, 465 U.S. 783 (1984), personal jurisdiction is proper where a defendant aims defamatory statements at a forum state knowing the effects will be felt there. This Court has also made clear the *Calder*

16

"effects" test is just one part of the ordinary minimum-contacts analysis, as courts must consider it as part of the full range of a defendant's forum contacts. Further, courts must analyze a defendant's forum contacts collectively—not in isolation—undertaking a realistic approach rather than a mechanical or technical one. And when a district court rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, it must accept as true the plaintiff's uncontroverted allegations and resolve any factual conflicts in the plaintiff's favor.

Had the district court properly applied these standards, it would have found specific personal jurisdiction. Lively purposefully directed her activities toward Texas in multiple, interconnected ways. For one, in her CRD and Draft Complaints, she published false and defamatory statements aimed at the Wallace Parties, repeatedly emphasizing they are "Texas-based" and alleging misconduct *from Texas*—making Texas the focal point of these accusations, not mere biographical background. The brunt of the reputational, economic, and emotional harm that Lively allegedly intended was designed to be suffered, and was in fact suffered, in Texas where the Wallace Parties reside, work, and operate.

Lively's Texas contacts also extend well beyond her defamatory publications themselves. She then affirmatively invoked the jurisdiction of a Texas district court by filing a Rule 202 petition for pre-suit deposition in Hays County—seeking to investigate the very same false allegations she published through the CRD and Draft Complaints. In her sworn petition, she confirmed that "a substantial part of the events giving rise to the claims that [Lively] seeks to investigate occurred in Hays County, [Texas]." She paid filing fees to the Hays County clerk and contracted with Texas process servers to serve Wallace at his home in the Texas hill country—making seven service attempts before nonsuiting the petition. These actions demonstrate purposeful availment of Texas law and its procedures. Lively also traveled to Texas on multiple occasions, including to the SXSW conference and to Waco. The Wallace Parties alleged, with Lively offering no controverting evidence, that during these visits Lively repeated defamatory statements about the Wallace Parties and refused to retract her prior false statements when confronted.

The Wallace Parties thus satisfied their minimum-contacts burden, and they just as easily demonstrated that their claims arise out of or relate to these forum contacts. The CRD and Draft Complaints are the

18

core of the defamation claims here. Additionally, Lively's Rule 202 lawsuit about the very accusations at issue, her Texas process-serving campaign, and her in-state republication or ratification of the accusations all constitute activities and occurrences in Texas that certainly relate to the Wallace Parties' defamation claims. Indeed, Lively's invocation of the Texas judicial system and her stated need to investigate and obtain evidence concerning her claims relate directly to the truth or falsity of her defamatory allegations and Lively's fault in making them.

Instead of conducting the analysis required by Supreme Court and Fifth Circuit precedent, the district court compartmentalized Lively's contacts. It evaluated her Rule 202 petition, Texas-focused defamatory statements, and in-state visits as separate, self-contained bases for jurisdiction, failing to consider the totality of her forum-directed conduct. The court also improperly weighed the evidence *against the Wallace Parties* by discounting Lively's sworn Texas court filings based on inapposite authorities involving defendants who merely participated in litigation while continuously objecting to jurisdiction—unlike Lively, who affirmatively initiated the Texas proceeding. And the court rejected the Wallace Parties' uncontroverted allegations about Lively's defamatory

19

conduct in Texas, applying a higher evidentiary standard based on discovery in the separate Southern District of New York litigation *in which the Wallace Parties were found not subject to personal jurisdiction*. These errors, if allowed to stand, will cause greater confusion over application of personal-jurisdiction principles in this Circuit.

Finally, exercising jurisdiction over Lively is fair and reasonable. It was Lively's burden to establish otherwise, and she did not even try. Texas has a significant interest in adjudicating defamation claims brought by its residents for injuries inflicted by an out-of-state actor who targets Texas by name, invokes Texas judicial processes, and engages in in-state repetitions. Any burden on Lively is modest given her own voluntary Texas engagements.

The Court should rule that the district court has specific personal jurisdiction over Lively, reverse the judgment below, and remand.

## ARGUMENT

### I. This Court reviews the ruling below de novo.

Appellate courts review de novo a district court's Rule 12(b)(2) dismissal for lack of personal jurisdiction. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). The

plaintiff bears the burden of proving personal jurisdiction but need only establish a *prima facie* case to satisfy its burden. *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019); *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000). When, as here, a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve any factual conflicts in the plaintiff's favor. *Stripling*, 234 F.3d at 869; *see also Walk Haydel*, 517 F.3d at 241 ("[U]nless there is a full and fair hearing, [the court] should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts.").

Personal jurisdiction is proper where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process. *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020). Texas's long-arm statute reaches the bounds of due process, so the analysis turns on whether the exercise of personal jurisdiction offends due process. *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010).

The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a defendant when the defendant has purposefully availed herself of the benefits and protections of the forum state by establishing minimum contacts with the forum state and the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. *Id.* (citing *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002)). A nonresident defendant's minimum contacts with a forum state may be established through either "general" or "specific" jurisdiction exercised by a federal court. Here, only the latter is at issue.

The Fifth Circuit applies a three-step analysis for the specific personal jurisdiction inquiry, considering: (1) whether the defendant has minimum contacts with the forum state, i.e., "whether [the defendant] purposely directed [her] activities toward the forum state or purposefully availed [her]self of the privileges of conducting activities there," *Grewal*, 971 F.3d at 490; (2) whether the plaintiff's claim arises out of or relates to those contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable. *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317-18 (5th Cir. 2021). Whether "the minimum contacts are

22

sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state." *Miss. Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982). This Court has explained the *Calder* "effects" test is "but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum." *Revell*, 317 F.3d at 473.

Once the plaintiff has established the first two elements (minimum contacts and sufficient connections to the claims), "the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

## II. The district court erred by dismissing the Wallace Parties' claims and failing to find specific personal jurisdiction here.

The dismissal ruling below should be reversed because the Wallace Parties made the required showing of specific personal jurisdiction over Lively. As explained below, (A) Lively has sufficient minimum contacts with Texas: she published false and defamatory statements targeting the Wallace Parties in Texas, invoked the jurisdiction of a Texas court by

filing, paying Texas entities for, and pursuing a Rule 202 petition to investigate those accusations (confirming under oath that "a substantial part of the events" occurred in Texas), and traveled to Texas on multiple occasions where she allegedly repeated her defamatory statements.  The district court held to the contrary only by misapplying the law on how to evaluate the allegations and the evidence and on how to assess the sufficiency of the Texas contacts.  Additionally, (B) the Wallace Parties' claims arise out of or relate to Lively's Texas-directed contacts, and (C) exercising jurisdiction is fair and reasonable—a burden Lively did not even attempt to rebut.  Properly analyzed, the Wallace Parties readily established specific personal jurisdiction over Lively.

### A.  Lively has sufficient minimum contacts with Texas for specific personal jurisdiction, and the district court legally erred in concluding otherwise.

The first element for personal jurisdiction, on which the Wallace Parties bear the burden only to present a *prima facie* case, is whether Lively has the requisite "minimum contacts" with Texas.  *Carmona*, 924 F.3d at 193.  In assessing this element (as with others), because the district court ruled here without an evidentiary hearing, the district court was required to accept as true the uncontroverted allegations in the

24

complaint and resolve any factual conflicts in favor of the Wallace Parties. *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

The law on "minimum contacts" is well-established. The analysis is fact-intensive, with no single element decisive, because whether "the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state." *Miss. Interstate Exp.*, 681 F.2d at 1006. The critical due-process consideration is whether "the defendant's conduct and connection with the forum State are such that [s]he should reasonably anticipate being haled into court there." *Revell*, 317 F.3d at 475. To that end, the specific jurisdiction inquiry demands a "highly realistic" approach, not a "mechanical or technical formulation." *Burger King v. Rudzewicz*, 471 U.S. 462, 478-79 (1985).

For these reasons, this Court analyzes a non-resident defendant's forum contacts *collectively* when undertaking the minimum-contacts analysis—even where the *Calder* "effects" test is at play. *See Allred v. Moore & Peterson*, 117 F.3d 278, 287 (5th Cir. 1997) ("[T]he key to *Calder*

is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum. Whether these effects, either alone or in combination with other contacts, are sufficient to support in personam jurisdiction will turn upon the particular facts of each case.") (quoting *Wallace v. Herron*, 778 F.2d 391, 395 (7th Cir. 1985)); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212-14 (5th Cir. 1999) (crediting both out-of-state communications directed into Texas and in-person visits to Texas for personal jurisdiction).

The Court also applies the "effects" test from *Calder v. Jones*, which permits a court to exercise personal jurisdiction over an author or publisher who "aims" a story at a state knowing the "effects" of the story will be felt there. 465 U.S. 783, 789-90 (1984). *Calder* was a libel suit by a California actress in California state court against a reporter and an editor—both working for the National Enquirer at its Florida headquarters. *Id.* at 784-85. The plaintiff's claims were based on an article written and edited by the defendants in Florida for publication in the National Enquirer, a national weekly newspaper. *Id.* The California Court of Appeals held that California's assertion of jurisdiction over the defendants was consistent with due process. *Id.* at 787.

26

The Supreme Court affirmed, focusing on all the contacts the defendants had with California—and not just those with the plaintiff. The Supreme Court found those contacts to be plenty; indeed, the defendants wrote the story about the plaintiff's California activities, the defendants relied on phone calls to "California sources" for the information in their article, they caused reputational injury in California by writing the allegedly libelous article that was widely circulated in the state, and the "brunt" of that injury was suffered by the plaintiff in that state.[1] *Id.* at 788-89. "In sum, California [wa]s the focal point both of the

---

[1] In undertaking the *Calder* analysis, this Court has declined to apply *Calder* rigidly, particularly where—as here—the context of the underlying statements renders inapplicable the "sources" or "research" prong. *See Defense Distributed v. Grewal*, 971 F.3d 485, 495-96 (5th Cir. 2020) (applying *Calder* and finding sufficient minimum contacts without rigid application of "sources" prong where, among other Texas contacts, the defendant mailed cease-and-desist letter to Texas threatening legal action); *Daughtry v. Silver Fern Chem., Inc.*, 138 F.4th 210, 216 (5th Cir. 2025) (finding personal jurisdiction under *Calder* without analyzing "sources" prong where defendant falsified documents and sent them to federal prosecutors in Texas, knowing brunt of injury would be felt there); *see also Clemens v. McNamee*, 615 F.3d 374, 384 n.5 (5th Cir. 2010) ("The 'research' prong of *Calder*, *Revell*, and *Fielding* is irrelevant in this case because [defendant] is not a journalist relying on external sources. He is the very person who claims to have committed the act which is the subject of the alleged libel. Unlike a journalist, such an alleged eyewitness would never be conducting 'research' in Texas or anywhere else on whether he himself is telling the truth.") (Haynes, J., dissenting).

story and of the harm suffered." *Id*. at 789. The Supreme Court held jurisdiction over the defendants was "therefore proper in California based on the 'effects' of their Florida conduct in California." *Id*.

In sum, the minimum-contacts analysis, as applied by this Court, requires a holistic, fact-driven assessment of the defendant's contacts with the forum. *Allred*, 117 F.3d at 287. The *Calder* "effects" test is important but not the entirety of the analysis. *Revell*, 317 F.3d at 473. And throughout the analysis, the district court was required to credit the Wallace Parties' allegations and favor them in the event of any factual disputes. *Walk Haydel*, 517 F.3d at 241.

### 1. The district court misapplied the controlling standard in numerous ways.

Contrary to all this law on specific personal jurisdiction (just discussed), the district court's ruling reflects at least three interrelated errors. Any of them is sufficient to reverse the decision below.

***First***, the district court failed to apply the correct legal standard, improperly weighing jurisdictional evidence rather than crediting the Wallace Parties' uncontroverted allegations and resolving factual disputes in their favor. Most prominently, the court discounted Lively's *purposeful invocation of a Texas court* by agreeing with Lively that her

28

Rule 202 petition was "not an 'original action'" and was "not otherwise litigate[d] extensively on the merits." ROA.4451. The Wallace Parties alleged in detail about Lively's verified Rule 202 filing with a Texas court seeking evidence relating to the false and defamatory claims made in her CRD and Draft Complaints—where she swore that major events relevant to her claims occurred in Texas—along with her payment of filing fees to that court and her hiring of a Texas law firm and Texas process servers. ROA.1785-86, 1794-95, 1798, 1803. Yet the court found this set of contacts legally immaterial on its own, including by deeming a Rule 202 petition not technically an "original action" and discounting the other Texas-lawsuit actions as not independently significant, and then gave this set of contacts no weight in jurisdictional analysis. ROA.4451-54.

Whatever the specific *reasons* for the district court's decision to disregard these clearly Texas-directed allegations, it was legal error. Discounting uncontroverted Texas forum allegations, either entirely or as carrying less weight in the analysis, cannot be reconciled with the law on assessing forum contacts in this context. *See, e.g.*, *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990*)*; *Cent. Freight Lines*, 322 F.3d at 383-84; *Walk Haydel*, 517 F.3d at 241-42.

Notably, the court drew its conclusion from cases in which the non-resident defendants never initiated any legal action in the forum state and, instead, participated merely as defendants while continuously objecting to the court's personal jurisdiction. *See PaineWebber Inc. v. Chase Manhattan Private Bank (Switz.)*, 260 F.3d 453, 460-61 (5th Cir. 2001) (finding no submission to Texas court's jurisdiction where foreign bank commenced its suit in New York state court, opposed transfer to Texas on jurisdictional grounds, specially appeared for limited purpose of seeking retransfer, asserted no counterclaims and engaged in no third-party practice, and premised all motions on continuing objection to court's personal jurisdiction); *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 540-41 (5th Cir. 2019) (non-resident insurer lacked minimum contacts with Texas where it never initiated an original action in Texas, participated only as defendant in two relevant actions, continuously objected to court's personal jurisdiction, and submitted to court's jurisdiction solely to compel arbitration).

But here, unlike the nonresident defendants in *PaineWebber* and *Halliburton*, Lively *affirmatively initiated* the Rule 202 proceeding in a Texas court and, in her sworn petition, confirmed that "a substantial part

30

of the events giving rise to the claims that [Lively] seeks to investigate"—
*i.e.*, the same false claims Lively previously published in the CRD and
Draft Complaints—"occurred in Hays County, [Texas]." ROA.1794, 3511.
She also voluntarily hired Texas counsel, paid filing fees to that court,
and retained Texas process servers to effectuate service.  ROA.1785-86,
3382-83, 3385.  The Wallace Parties' uncontroverted allegations relating
to these Texas contacts, among Lively's other Texas-focused activities,
should have been accepted as true and given full weight in the minimum-
contacts analysis "as part of the full range of the defendant's contacts
with the forum." *Revell*, 317 F.3d at 473.

**_Second_**, the district court relatedly erred by analyzing each of
Lively's various Texas contacts in isolation.  The totality of Lively's
Texas-related contacts is powerful, including her Texas-focused false and
defamatory statements in the CRD and Draft Complaints; her
affirmative invocation of a Texas court's jurisdiction and Texas
procedures through the filing of her Rule 202 petition relating directly to
Lively's false statements in the CRD and Draft Complaints (namely, the
truth or falsity of those statements and Lively's fault in making them);
and her alleged in-state repetition of defamatory statements in Austin

and in Waco. ROA.1785-87, 1791, 1793-95, 1798-1803. Yet the district court evaluated and rejected each category of contacts in a vacuum, instead of considering them all together and what their overall weight means for the specific personal jurisdiction analysis. ROA.4450-59.

This compartmentalized approach contradicts fundamental jurisdictional principles that requires a holistic and flexible approach. *See, e.g.*, *Burger King*, 471 U.S. at 478-79; *Allred*, 117 F.3d at 287. For example, this Court has rejected the notion that the minimum-contacts analysis can turn "on a mechanical and quantitative test," because what matters is "the particular facts upon the quality and nature of the activity with relation to the forum state." *Miss. Interstate Exp.*, 681 F.2d at 1006. The Court has also explained that the *Calder* "effects" test is "but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum." *Revell*, 317 F.3d at 473. Because of the "highly realistic" approach required by the specific-jurisdiction inquiry, this Court has analyzed a non-resident defendant's forum contacts collectively in undertaking the analysis. *Wien Air Alaska, Inc.*, 195 F.3d at 212-14.

32

A strong example is *Wien Air Alaska, Inc. v. Brandt*. There, the Court credited not only the defendant's out-of-state communications directed into Texas but also his in-person visits to Texas during which he gained confidential information he would later use against the plaintiff, holding that the aggregate of the contacts supported jurisdiction. *Id.*; s*ee also Walk Haydel*, 517 F.3d at 243 ("[Defendant's] purposeful contacts with Louisiana, *in combination with* the foreseeable harmful effects in Louisiana of its allegedly illegal activity, makes specific jurisdiction proper.") (emphasis added).

The district court here, in contrast, applied a compartmentalized approach that failed to consider the full range of Lively's contacts with Texas—including as part of the *Calder* "effects" test, but even regardless of it. *See, e.g.*, *Allred*, 117 F.3d at 287; *see also Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1361-63 (7th Cir. 1996) ("We emphasize that by discussing its contacts with Wisconsin in isolation and suggesting that none alone establishes the requisite minimum contacts, [defendant] fails to appreciate that the minimum contacts inquiry is one that examines the totality of the circumstances."). In doing so, the district court considered—and dismissed—Lively's

various Texas contacts in isolation and without examining the totality of the circumstances of those contacts. ROA.4450-59.

Had the district court conducted the required aggregate analysis, it would have credited a mosaic of interconnected, forum-directed conduct. Lively affirmatively invoked a Texas court's jurisdiction to investigate the accusations at issue in this lawsuit, making sworn statements to the Texas court about conduct she attributed to the Wallace Parties in Texas. ROA.1794, 3511. She paid Texas filing fees and hired Texas lawyers and process servers. ROA.1785-86, 3382-83, 3385. She published and widely disseminated the CRD and Draft Complaints identifying the Wallace Parties and falsely accusing them of conduct that Lively emphasized as occurring in Texas, knowing the publications would be (and were) republished by Texas media. ROA.1783-84, 1793. And she traveled to Texas on multiple occasions and allegedly, when confronted about her accusations, refused to retract or clarify. ROA.1787, 1799-1801. The district court also erred in how it dissected each of these allegations, but it legally erred simply because it undisputedly never considered the whole of these Texas forum contacts in their aggregate.

Lively's Texas-directed conduct should not have been considered in isolation. Together, these contacts demonstrate that Lively "should reasonably anticipate being haled into court" in Texas. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

***Third***, the district court also improperly rejected the Wallace Parties' detailed, uncontroverted "information and belief" allegations. ROA.4459. The Wallace Parties alleged that, during Lively's March 2025 appearance in Austin, Texas at SXSW and a contemporaneous visit to Waco, Lively refused to retract her accusations when confronted and allegedly repeated defamatory remarks about the Wallace Parties. ROA.1787. Yet the district court dismissed these allegations wholesale, suggesting the Wallace Parties should have presented more factual detail because of the discovery that may have been allowed in the separate Southern District of New York litigation involving different claims:

> While the Court recognizes that Plaintiffs may not have had extensive opportunity in the present case to conduct discovery, the issues underlying this case have been under extensive litigation in other courts for nearly a year and yet Plaintiffs fail to provide the Court with any greater level of detail beyond the speculation that "on information and belief," Defendant repeated the defamatory remarks while in Texas.

35

ROA.4459. Indeed, the court rested its analysis on this despite the fact that the Wallace Parties were themselves successfully dismissed from the Southern District of New York litigation for lack of personal jurisdiction there. ROA.4395-4439.

In wrongly discarding these "information and belief" allegations, the district court relied on *Elec. & Gas Tech, Inc. v. Universal Commc'n Sys., Inc.*, 2003 WL 22838719, *5 (N.D. Tex. 2003). But there, the plaintiff merely alleged on information and belief that the defendant had made "material contacts in Texas." *Id.* The Wallace Parties' allegations here were factual, specific, and detailed. ROA.1787.

The decisions that Lively relied on in her motion to dismiss are similarly readily distinguishable. For example, in *Salermo v. Hughes Watters & Askanase LLP*, 516 F. Supp. 3d 696, 701, 710-11 (S.D. Tex. 2021), the court did not even address personal jurisdiction or analyze the "information and belief" statements there under this legal standard. Even so, the allegations analyzed in *Salermo* were factually unsupported and indeed directly contradicted by submitted evidence—something that Lively could have attempted, but did not do. *Id.* at 710; *see Utterkar v. Ebix, Inc.*, 2015 WL 5027986, at *4 (N.D. Cal. 2015) ("[Defendant] argues

that the allegation in the proposed SAC that he lives in California should not suffice to establish the Court's personal jurisdiction because the allegation is made only on 'information and belief' without any supporting evidence . . . [Defendant] has not submitted any affidavit indicating that he does not live in California . . . . Therefore, the proposed SAC would support the Court's exercise of personal jurisdiction over [Defendant] . . . .").

Similarly, in *Ramirez v. Chenega Corp.*, 2006 WL 8434037, at *4 (W.D. Tex. 2006), the court noted that the plaintiff's personal-jurisdiction allegations concerning the defendant were controverted by the evidence—which made clear that another party, not the defendant, was the counterparty to the underlying and relevant contracts. In *Mullinix v. Thirty-Eight Street, Inc.*, 2019 WL 4579869 (W.D. Tex. 2019), the court emphasized that, as it related to the plaintiff's claims for negligent misrepresentation and fraud, the plaintiff "failed to allege that the . . . Defendants made any false representations to [p]laintiff *while [Defendants] were physically present in Texas*" and, instead, argued only that the defendants made misrepresentations "to Plaintiff via emails and texts *while Plaintiff was in Texas.*" *Id.* at *3-5 (emphasis added). Here,

37

by contrast, the Wallace Parties included specific allegations relating to Lively's physical presence in both Austin and Waco, even apart from her other contacts seeking out the Texas forum (including Texas courts).

Other cases that Lively cited below are likewise off-base. In *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 2000 WL 35615925, at *3 (N.D. Tex. 2000), the plaintiff relied on bare and conclusory allegations that the defendant "knew [plaintiffs] resided in Texas and purposefully directed its actions to injure Texas residents 'such that [defendant] should reasonably and foreseeably anticipate being haled into the courts of this state to answer for its actions.'" And in *Tittle v. Kansas Geological Soc'y*, 2009 WL 10704726, at *6 (N.D. Tex. 2009), the plaintiff merely alleged "generally" that "Defendant made defamatory statement about him which caused him damages." All these allegations merely recite personal-jurisdiction principles and are thus distinguishable from the Wallace Parties' *factual* allegations identifying specific venues in Texas and the contextual circumstances of alleged in-state defamatory conduct.

Notably, Lively had every opportunity to, but did not, submit a declaration or other evidence controverting the Wallace Parties' allegations of what she said or did while in Texas. Under the controlling

38

legal standard, the Wallace Parties' uncontroverted allegations must be taken as true, yet the district court wrongly dismissed them and instead held the Wallace Parties to a higher evidentiary standard based on discovery in the separate Southern District of New York litigation.  That was error and requires reversal.  *See Bullion*, 895 F.2d at 217 (reversing dismissal for lack of personal jurisdiction because district court "failed to recognize that [the plaintiff] needed only to establish a *prima facie* case of personal jurisdiction" and improperly "dismiss[ed] . . . jurisdictional assertions . . . that were at odds with competing assertions made by [defendant]"); *Metro Equip. & Rental Co., Inc. v. Tsurumi Mfg. Co., Ltd.*, 2022 WL 1491099, *8 (W.D. Tex. 2022) ("There exist no assertions which would contradict or otherwise conflict with the relevant jurisdictional allegations as propounded by [plaintiff] . . . .  Therefore, the undersigned finds that [defendant] has not adequately controverted [plaintiff's] factual allegations.").

**2.    Properly analyzed, Lively's Texas-directed activities satisfy the "minimum contacts" needed to support specific personal jurisdiction.**

Under the controlling standard and required aggregate analysis, the Wallace Parties made the required showing of specific personal

39

jurisdiction under Texas's long-arm statute and the Fourteenth Amendment because Lively purposefully directed suit-related conduct at Texas and purposefully availed herself of the privileges and benefits of the forum. *See, e.g.*, *Grewal*, 971 F.3d at 493, 495-96; *Allred*, 117 F.3d at 287; *Wien Air Alaska*, 195 F.3d at 212-14.

As explained above, the Wallace Parties have alleged that Lively disseminated false and defamatory statements about them. ROA.1783-84, 1793. She knew the Wallace Parties were located in Texas—indeed, she made a point to emphasize this fact in her false statements about them in the CRD and Draft Complaints—and therefore knew her acts of publishing and disseminating these defamatory statements would harm the Wallace Parties *in Texas*. ROA.1791, 1798, 1824, 1859.

And her knowing and purposeful Texas-directed actions did not stop there: just a few weeks later, Lively filed her Rule 202 petition in Hays County, Texas seeking to obtain evidence from Wallace relating to the same false allegations she made in the CRD and Draft Complaints. ROA.1785-86, 2474-88. In her verified petition, Lively reiterated under oath her focus on the Wallace Parties being located in Texas. ROA.2474, 2477, 2482. She emphasized, consistent with her prior publication of

40

false statements, that "Wallace worked remotely from Dripping Springs, Texas . . . to undermine the credibility of and retaliate against Ms. Lively through this 'social manipulation' campaign." ROA.2477. She also averred that "a substantial part of the events giving rise to the claims that [Lively] seeks to investigate occurred in Hays County, [Texas]." ROA.3511. Lively paid Texas lawyers, Texas process servers, and the Texas court to pursue this lawsuit affirmatively invoking the privileges and procedures of Texas law. ROA.1785, 2474-88, 3382-83, 3385. Lively then continued her Texas contacts by traveling there for high-visibility events, including SXSW in Austin and the visit to Waco, where she allegedly repeated her defamatory statements about the Wallace Parties and refused to retract her prior statements when confronted. ROA.1787.

Like in *Calder*, Lively's false and defamatory statements about the Wallace Parties in the CRD and Draft Complaints concerned allegations of *Texas* activities of both a *Texas* resident and *Texas* corporation—indeed, Lively herself focused her own allegations on the Wallace Parties' Texas location. 465 U.S. at 788-89. Like in *Calder,* the statements "impugned the professionalism" and reputation of the Wallace Parties, whose business operations are centered in *Texas*. *Id*. at 788. And like in

*Calder*, the brunt of the harm suffered by the Wallace Parties is in *Texas*. *Id.* at 789; *see Stone v. Shafran*, 641 F. Supp. 3d 1344, 1360 (S.D. Fla. 2022) (*Calder* effects test met where defendants "made defamatory statements in the Article aimed at Florida because the Article identified the fraudulent activity as occurring in Miami, Florida" and defendants "specifically targeted these Florida residents by making defamatory statements about them and identifying them as living in Florida and operating their business in Florida.").

The district court faulted the Wallace Parties for not identifying any Texas sources relied on by Lively. ROA.4457. But this Court has declined to apply *Calder* rigidly where, as here, the context of the underlying statements renders inapplicable the "sources" or "research" prong. *See, e.g.*, *Grewal*, 971 F.3d at 495-96 (applying *Calder* and finding sufficient minimum contacts without rigid application of "sources" prong where, among other Texas contacts, the defendant mailed cease-and-desist letter to Texas threatening legal action). Unlike a journalist relying on external sources, Lively is the very person who claims personal knowledge of the acts she alleged in the CRD and Draft Complaints,

42

rendering any consideration of "sources" inapplicable. Specific personal jurisdiction is proper based on *Calder* alone.

Moreover, even apart from *Calder*'s effects test, Lively's various Texas contracts—described in detail above—show that she purposefully availed herself of the benefits and protections of the State of Texas. That includes all her activity in pursuing the Rule 202 lawsuit, purposefully invoking the Texas judicial system in an action relating to the same false and defamatory statements that Lively published in the CRD and Draft Complaints and then disseminated widely to the press. ROA.1785-86, 1794-95, 1798, 1803, 2474-88, 3382-83, 3385. And in doing so, Lively expressly reiterated her focus on Texas. *E.g.*, ROA.3506, 3511. While Lively nonsuited her Rule 202 petition before the Texas court could rule, that is not dispositive—and, tellingly, it came only after her agents attempted seven service attempts on the Wallace Parties at Wallace's private residence in the Texas hill country. ROA.3382-83, 3385, 3458. The forum contacts also include Lively's personal travels to Texas and the allegations about those trips that specifically bear on defamatory remarks. ROA.1787.

Critically, Lively never controverted any of these allegations, even though it would have been straightforward for her to do so if any of the allegations were not true. Indeed, the allegations that Lively repeated the defamatory remarks *while she was in Texas* went unchallenged by either evidence or argument. ROA.2961-65. The district court could find specific personal jurisdiction lacking, on this record, only by openly disregarding certain key allegations and failing to assess all the Texas forum contacts in the aggregate, which was legally mistaken.

This Court's analysis in *Defense Distributed v. Grewal* is instructive. 971 F.3d at 488. In *Grewal*, the Court found personal jurisdiction was proper over a non-resident defendant under the principles discussed in *Calder* and in *Wien Air Alaska*.[2] The plaintiffs in *Grewal* filed suit against New Jersey's Attorney General Gurbir Grewal and several of his peers, alleging their First Amendment rights had been violated and asserting state-law claims based on Grewal's efforts to

---

[2] In *Wien Air Alaska*, the Court relied largely on the *Calder* effects test in analyzing the non-resident defendant's contacts. 195 F.3d at 211-14. The Court found the defendant "performed several tortious actions outside of Texas directed towards Wien Air in Texas," including letters, faxes, and phone calls to Texas with fraudulent misrepresentations. *Id.* at 212. The Court found that "[t]hese activities had foreseeable effects in the forum and were directed at the forum." *Id.*

hamstring plaintiffs' distribution of materials related to the 3D printing of firearms. In analyzing personal jurisdiction over Grewal, this Court considered Grewal's various contacts:

> Grewal's conduct beyond sending the cease-and-desist letter confirms his intent to crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey. Grewal's enforcement actions are selective. He has not targeted the many similarly-situated persons who publish Defense Distributed's files on the internet . . . . Instead, he has focused solely on Defense Distributed. Perhaps nowhere is this better illustrated than in Grewal's efforts to enjoin the national distribution of Defense Distributed's files by suing in Washington, far from his or the plaintiffs' home state. Grewal has also threatened Defense Distributed's founder, Cody Wilson, by name, promising to 'come after' 'anyone who is contemplating making a printable gun' and 'the next ghost gun company.'

*Id.* at 493. The Court found these contacts amounted to "more than a mere fortuity" and subjected Grewal to Texas jurisdiction. *Id.* at 496.[3]

Like the plaintiff in *Grewal*, the Wallace Parties here attribute their injuries to the false and defamatory statements made by Lively

---

[3] *See also* 971 F.3d at 496 n.10 ("Today's holding is derivative of the specific language used in Grewal's cease-and-desist letter coupled with other actions he took that, together, demonstrate his intent to gut Defense Distributed's operations and restrict Texans' access to Defense Distributed's materials. That the plaintiff's injuries are directly attributable to the cease-and-desist letter itself also weighs heavily in our analysis.").

45

about them—and specifically, about their alleged activities *in Texas*—in Lively's CRD and Draft Complaints that were disseminated widely, including to Texas media. And like the defendant in *Grewal*, Lively took other actions beyond her Texas-focused defamatory statements demonstrating her intent to target the Wallace Parties, including by invoking the Texas judicial system to investigate the false and defamatory allegations made in the CRD and Draft Complaints. Lively's contacts with Texas "are more than a mere fortuity." 971 F.3d at 495. Lively has established sufficient minimum contacts with Texas to subject her to the jurisdiction of Texas's courts.

### 3. The authorities relied on by Lively and the district court are materially distinguishable.

The line of *Calder* decisions cited and relied on by Lively in her motion, and by the district court in its order, are readily distinguishable from the facts and contacts here.

For example, in *Fielding v. Hubert Burda Media, Inc.*, the Fifth Circuit applied the *Calder* effects test to allegedly libelous articles concerning the German activities of individuals physically located in Germany. 415 F.3d 419, 427 (5th Cir. 2005). There, the complained-of German articles concerned the alleged affair between a citizen of

46

Switzerland (Fielding's spouse) and a European model and the aftermath of the affair—activities that all occurred in Germany and Switzerland. *Id.* at 426. The references to Texas were purely background and biographical references relating to Fielding and, as explained by the Court, "the series of articles impugned the professionalism of a diplomat and his wife whose careers were centered in Europe, not Texas" and "the brunt of the harm, in terms of appellants' injury to their professional reputations and their emotional distress, was suffered in Germany, not Texas." *Id.* at 427.

Lively's conduct is categorically different. Lively herself made Texas the focal point of the false and defamatory statements about the Wallace Parties, attributing the falsely alleged misconduct to work performed in and from Texas. ROA.1824, 1859. She then invoked the Texas courts and Texas processes to investigate those very accusations. ROA.1785-86, 1794-95, 1798, 1803. Lively knew the Wallace Parties were Texas residents, she ensured her defamatory statements would be republished worldwide—including in Texas—and she knew the brunt of the reputational and economic harm would be suffered in Texas, where the Wallace Parties live and maintain their business. ROA.1783-84,

47

1788, 1793 1824, 1859. *Fielding* does not insulate an out-of-state publisher who, unlike the German defendants there, deliberately centers the Texas forum as the locus of the alleged conduct and then meaningfully engages the forum's judicial system and audience, as Lively did here.

Likewise in *Clemens v. McNamee*, the Fifth Circuit analogized the contacts to those assessed in *Fielding*, explaining "the statements in [*Clemens*] concerned non-Texas activities—the delivery of performance-enhancing drugs to Clemens in New York and Canada." 615 F.3d 374, 380 (5th Cir. 2010). Unlike the statements in *Clemens*, Lively's statements expressly tied the Wallace Parties' supposed role to Texas and asserted the conduct occurred from Texas, while Lively separately swore in her Texas lawsuit that a "substantial part of the events giving rise to the claims" relating to her allegations in the CRD and Draft Complaints occurred in Hays County. ROA.3511. Lively's own conduct made Texas the focal point of both the false statements and the harm.

This Court's decision in *Herman v. Cataphora, Inc.* is similarly distinguishable. There, the Court emphasized that the complained-of statements "never mentioned Louisiana explicitly or implicitly" and "did

48

not refer to specific actions taken in Louisiana." 730 F.3d 460, 465 (5th Cir. 2013). The Court found the district court lacked personal jurisdiction because there was no showing "that the statements' focal point was Louisiana." *Id.* at 466; *see also Walden v. Fiore*, 571 U.S. 277, 289 (2014) ("[non-resident defendant] never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [the forum state]."). Lively's statements, and her related Texas-directed contacts, require a different conclusion than all these authorities.

## B. The Wallace Parties' claims arise out of or relate to Lively's Texas contacts.

The second step of the personal-jurisdiction analysis considers whether the plaintiff's claim arises out of or relates to the non-resident defendant's contacts with the forum. *Johnson*, 21 F.4th at 317-18. As the Supreme Court has explained, "[t]he first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). The due process "connection" is therefore satisfied when there is an "affiliation between the forum and the underlying controversy,

49

principally, an activity or an occurrence involving the defendant that takes place within the State's borders." *Id.* at 352.

This element is straightforward here, given how plainly Lively's Texas contacts are connected to the Wallace Parties' defamation claims. First, Lively's CRD and Draft Complaints, which substantively target the Wallace Parties *in Texas* and were disseminated to Texas, are the center of the Wallace Parties' defamation claims. ROA.1783-84, 1788, 1793 1824, 1859. There is an obvious causal connection, and certainly sufficient connection for specific personal jurisdiction. Second, Lively's Texas-directed filing and pursuit of her Rule 202 lawsuit in Texas court were about the very same false accusations she publicized and widely disseminated, seeking to obtain evidence relating to those accusations. ROA.1785-86, 1794-95, 1798, 1803. Lively cannot seriously deny the "related to" connection between her Rule 202-related actions and the Wallace Parties' claims; indeed, Lively's invocation of the Texas judicial system through her petition, and her stated need to investigate her claims, relate directly to the truth or falsity of her defamatory allegations and Lively's fault in making them. Third, Lively's alleged in-state republication or ratification of the accusations also are "activities" and

50

"occurrences" in Texas that relate to and are affiliated with the Wallace Parties' defamation claims. ROA.1785-87, 1791, 1793-95, 1798-1803.

In her motion to dismiss below, Lively relied on *Ford* and argued that her filing of the Rule 202 petition and related contacts fail this second prong of the personal-jurisdiction analysis because, "[i]f Ms. Lively had never filed the Rule 202 Petition, [the Wallace Parties'] claims about the CRD Complaint would remain intact and unchanged." ROA.2963. Lively's argument, resting on a strict but-for causation test, is squarely addressed and disposed of by the very authority she relies on. *See Ford*, 592 U.S. at 361-62 ("But Ford's causation-only approach finds no support in this Court's requirement of a 'connection between plaintiff's suit and a defendant's activities. . . . None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do.").

The district court did not address or decide this second element, resting only on its misguided minimum-contacts analysis. ROA.4449-60. But the second prong is so clear-cut, and barely contested below (as distinct from the first prong), that this Court should resolve it. And to the extent the district court's reasons for rejecting specific personal

51

jurisdiction can be read to implicitly address this second element, those reasons are legally flawed and warrant reversal for all the same reasons that the Wallace Parties describe above. *See supra* Part II.A.

In short, Lively's contacts with Texas are more than sufficient under the minimum-contacts analysis and, once the Court reaches that conclusion, it is hardly disputable that the Wallace Parties' defamation claims arise from or are related to those Texas connections. Lively's web of contacts—her false statements emphasizing the Wallace Parties' alleged misconduct in Texas, her invocation of the Texas judicial process concerning those very allegations, her widespread dissemination of her false statements resulting in both national and local Texas publications, and her republication or ratification of the accusations while physically in Texas—create the forum-linked affiliation that *Ford* requires.

### C.     Exercising jurisdiction over Lively is fair and reasonable, and Lively did not argue otherwise.

Once a plaintiff makes a *prima facie* showing of the first two prongs (minimum contacts and relatedness), the burden shifts to the defendant to defeat personal jurisdiction by showing that its exercise would be unfair or unreasonable. *Seiferth*, 472 F.3d at 271. "If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction

over the nonresident not comport with traditional notions of fair play and substantial justice." *DeJoria v. Maghreb Petroleum Expl., S.A.*, 804 F.3d 373, 388-89 (5th Cir. 2015) (citing *Moncrief Oil Int'l Inc. v. Oao Gazprom*, 414 S.W.3d 142, 154-55 (Tex. 2013). To avoid jurisdiction once minimum contacts are shown, the nonresident defendant "must present a compelling case" that the exercise of jurisdiction would be unreasonable. *See Burger King*, 471 U.S. at 477.

Lively did not meet her burden on this third element—nor did she even try to, thus forfeiting the issue. Regardless, Lively cannot meet her burden on it because the relevant factors readily confirm that jurisdiction is fair and reasonable. Courts consider five factors: "(1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies." *Seiferth*, 472 F.3d at 276 (quotations omitted).

Here, Texas has a significant interest in adjudicating defamation claims brought by its residents and corporations for injuries inflicted by an out-of-state actor who targeted Texas by name, invoked Texas judicial

53

processes concerning her defamatory accusations, and then engaged in in-state repetitions. *See Ford*, 592 U.S. at 368 (states have significant interest in "providing their residents with a convenient forum for redressing injuries inflicted by out-of-state actors.") (quoting *Burger King*, 471 U.S. at 473). The Wallace Parties' interest in convenient and effective relief is likewise acute because the economic, reputational, and emotional harms were felt most keenly in their Texas community.

Further, while the larger Hollywood drama surrounding Blake Lively has involved litigation with other parties in other states, the interstate judicial system's efficiency is served by allowing the forum most affected by *this* controversy between *these parties*—Texas—to resolve claims whose gravamen is Texas-centered allegations and Texas effects. And any burden on Lively to litigate in Texas is modest given her own voluntary Texas engagements, including travel to Texas for high-profile events and her affirmative use of a Texas court and Texas systems to press the same accusations that underpin this suit, all of which provided "clear notice" that she could be haled into a Texas court.

*     *     *

The Wallace Parties established a *prima facie* case of personal jurisdiction over Lively, demonstrating that she has more than sufficient minimum contacts with Texas and that the Wallace Parties' defamation claims arise from or are related to those Texas contacts. Lively did not even argue, much less carry her burden to show, that the exercise of jurisdiction over her is anything but fair and reasonable. Jurisdiction in Texas courts is proper for the Wallace Parties' claims against Lively.

## CONCLUSION

For these reasons, the Wallace Parties respectfully ask the Court to reverse the district court's order and judgment dismissing their claims for lack of personal jurisdiction and to remand for further proceedings.

Respectfully submitted,

/s/ *Charles L. Babcock*

| | |
|---|---|
| Jeffrey L. Oldham | Charles Lynde Babcock |
| JACKSON WALKER LLP | Joel Robert Glover |
| 100 Congress, Suite 1100 | JACKSON WALKER LLP |
| Austin, Texas 78701 | 1401 McKinney Street |
| (512) 236-2000 | Houston, Texas 77010 |
| (512) 236-2002 (fax) | (713) 752-4200 |
| | (713) 308-4110 (fax) |
| | cbabcock@jw.com |

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I certify that this brief was filed with this Court via the Court's CM/ECF system on May 15, 2026, and that an electronic copy of it was served on counsel of record, as listed below, via the Court's CM/ECF system on the same date:

Michael J. Gottlieb
mgottlieb@willkie.com
Kristin Bender
kbender@willkie.com
Aaron E. Nathan
anathan@willkie.com
WILLKIE FARR &
   GALLAGHER LLP
1875 K Street
Washington, D.C. 20006
(202) 303-1245

Laura Lee Prather
laura.prather@haynesboone.com
Catherine L. Robb
catherine.robb@haynesboone.com
Michael J. Lambert
michael.lambert@haynesboone.com
Reid Pillifant
reid.pillifant@haynesboone.com
HAYNES AND BOONE, LLP
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 867-8400
(512) 867-8470 (fax)

*Counsel for Defendant-Appellee*

/s/ *Charles L. Babcock*
Charles Lynde Babcock

### CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(A)(7)(B) because it consists of 10,751 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32.2.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft 365 Century Schoolbook in 14-point font.

/s/ *Charles L. Babcock*
Charles Lynde Babcock